**Leo George BECKER, Appellant,**

v.

**PHILCO CORPORATION, Appellee.**

**James J. TAGLIA, Appellant,**

v.

**PHILCO CORPORATION, Appellee.**

**Nos. 9756, 9757.**

United States Court of Appeals Fourth Circuit.

Argued March 4, 1965.

Decided Feb. 6, 1967.

Rodolphe J. A. de Seife, Washington, D. C. (Frank B. Tavenner and Robert Sheriffs Moss and Hart, Moss & Tavenner, Washington, D. C. on brief), for appellants.

Laidler B. Mackall, Washington, D. C. (W. W. Koontz, Alexandria, Va., Karl E. Wolf, Philadelphia, Pa., and Steptoe & Johnson, Washington, D. C., and Boothe, Dudley, Koontz & Blankingship, Alexandria, Va., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, and SOBELOFF and BRYAN, Circuit Judges.

ALBERT V. BRYAN, Circuit Judge:

This is a libel action by James Jude Taglia and Leo George Becker against their employer, Philco Corporation, for alleged defamation of them in a report made to the United States under the terms of a defense contract. On defendant's motion for summary judgment, the

District Court dismissed, holding the communication absolutely privileged. We affirm.

For the production of defense materials, the United States has found it necessary to let their manufacture to private industry. In this process national security requires that the Government be assured of the maintenance of secrecy of certain information passed to and generated by the manufacturer. To this end, only such employees of the latter as are cleared by the United States are given access to this secret—classified—data. Such a contract was made with Philco on December 11, 1961. It contained the general security provisions. Among them, and the bone of this controversy, is the covenant of the contractor to keep the Government advised of every proven or even suspected compromise of this confidence.

Plaintiffs here had been approved by the Government, and their work for Philco required them to have regular access to classified papers. Indeed, their value to the company depended upon their "authorized access". A suspected breach of this obligation by them was communicated to Philco in June and July 1962. It was investigated and the result reported to the Government. In the course of the latter's inquiry, the plaintiffs' clearances were temporarily suspended, awaiting the final decision of the administrative hearing guaranteed them by the regulations of the Department of Defense. As this meant the end of their usefulness to Philco, in January 1963 they lost their positions and the chance of similar employment, the principal damage claimed in this suit. The outcome of the administrative proceeding does not appear presently.

There is vagueness as well as conflict in the record as to when the suspicion was carried to Philco. For our purposes we accept the plaintiffs' averments that word was passed to the company by a disgruntled employee following discharge. It reached Philco in the early summer of 1962. The subsequent developments were summarized by the District Judge as follows:

"[U]pon receipt thereof [of the accusation] the security officer conducted an investigation of the circumstances reported. The results of this inquiry were then turned over to Robert M. Jones, Vice President of Philco Corporation in charge of industrial relations, for action in accordance with the requirements of the Department of Defense Industrial Security Manual for safeguarding classified information and the Security Agreement with the Defense Department. Mr. Jones participated in further inquiry of the subject matter which included informing both Mr. Becker and Mr. Taglia of the nature of the report and affording them a full opportunity to be heard, and permitting them to make statements concerning the matter under investigation. A report of the matter was then made to the Defense Department by Philco Corporation. These reports and all matters in connection therewith were handled in a confidential manner."

The defense of Philco is that its report to the United States is protected by an absolute privilege two-fold grounded. First, it was a communication required of and made by Philco as an agency of the United States government; and secondly, it was the initial step in a quasi-judicial proceeding, i. e. the administrative inquiry provided by the Defense Department as a remedy for an unjust implication. Since we hold the communication absolutely privileged on the first ground, we neither explore the mechanics of the administrative inquiry nor resolve the contention of the plaintiffs that it is not in any sense a judicial proceeding.

To start with, the agreement's pertinent provisions are these:

"SECTION I—SECURITY CONTROLS

"(A) The Contractor agrees to provide and maintain a system of security controls within its or his own organization in accordance with the requirements of the Department of Defense Industrial Security Manual for Safe-

guarding Classified Information attached hereto and made a part of this agreement. * * * "

In relevant part the Manual directs:

"Paragraph 6. REPORTS—The contractor shall submit immediately to the cognizant security officer—

\* \* \* \* \* \*

"b. A report, classified if appropriate, of any loss, compromise, or *suspected* compromise of classified information.

\* \* \* \* \* \*

"Paragraph 14.1. LOSS, COMPROMISE OR SUSPECTED COMPROMISE OF CLASSIFIED INFORMATION

"a. The contractor shall establish procedures to insure that each loss, compromise or *suspected* compromise of classified information is immediately reported to the appropriate official of the contractor having responsibility for security within the facility. Classified information which cannot be located shall be presumed to be lost until an investigation by the cognizant military department determines otherwise.

"b. Immediately upon receipt of such a report, the contractor shall initiate an inquiry to ascertain all of the circumstances of the loss or compromise. In the event of loss, a thorough search shall be conducted for the Classified information.

"c. The contractor shall make an *immediate report of the incident to the* cognizant security officer in accordance with paragraph 6.b" [supra]. (Accent added.)

The requisite system for receiving charges, investigating them and transmitting reports thereof to the Defense Department was installed by Philco. Even if the libelous report was not systematically made first to the "cognizant security officer" of the Defense Department, but conveyed earlier orally to another Department official with the written report sent to the Director of the Security Program Division, Office of the Secretary of Defense, all as the plaintiffs

contend, it is inconsequential. The content of the report, and not the means of its transmittal, is the gravamen of the complaints here.

To succeed in its motion, the company did not need to prove that the contents of the alleged compromising data were State or classified secrets. To expose the documents could have been a breach of the agreement and of national security. The prospect could force the defendant into the unfair dilemma of either a possible abrogation of its pledge of secrecy to the Government or abandonment of its principal defense to the libel action. Thus, too, if compellable, disclosure would enable an individual employee to destroy the vital protections written into the contract.

While these possibilities argue against the production, the overtopping reason for not requiring proof that the documents were State secrets is that it is irrelevant. These actions obviously are not premised on the character of the documents; they are based on the report of Philco to the United States. The defense at this juncture is not that the papers were classified. Judgment went for Philco not because the information comprised State secrets but because the publication of the report was clothed with immunity by law.

Nor were the plaintiffs injured by the absence of the report from the case. It was not in evidence, but the quotations from it and the denunciations of them in the plaintiffs' complaints, required the District Court to assume that the report was untrue. This hypothesis also included the plaintiffs' contention that the reported documents were of no value. It also accepted the plaintiffs' denigration of the report as an "edited", "excerpted" and "truncated" version of the intracompany memorandum which in its original form acquitted the plaintiffs of unfaithfulness to their trust.

To be predominantly emphasized here is that the contract embraces reports by Philco to the Government not only of actual but of each *suspected* compromise of classified information. Equally impor-

tant, the company has no discretion and is mandatorily ordered to report the suspicion immediately. There is no question but that the system of reporting was valid. The obligation could scarcely be couched in more imperious or exacting language. It embraces both true and false accusations, both substantial and insubstantial suggestions, perhaps encompassing even rumors. It demands investigation of them by the company and a report of it to the Defense Department. That is precisely what Philco did. Faithful to the contract, it could have done no less. The issue, then, is whether in these circumstances Philco may be held answerable for falsity and defamation in the report.

For its absolute privilege Philco analogizes its position with that of an executive agency of the Government. The immunity conferred on a Federal officer or agency, high or low in the echelon of the executive department of the United States, and the reasons therefor, have heretofore been declared generally, surely too well for us to venture a dissertation of our own. Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959); Howard v. Lyons, 360 U.S. 593, 79 S.Ct. 1331, 3 L.Ed.2d 1454 (1959). *Matteo* puts it pithily:

> "It has been thought important that officials of government should be free to exercise their duties unembarrassed by the fear of damage suits in respect of acts done in the course of those duties—suits which would consume time and energies which would otherwise be devoted to governmental service and the threat of which might appreciably inhibit the fearless, vigorous, and effective administration of policies of government. * * *
>
> * * * * * *
>
> "The privilege is not a badge or emolument of exalted office, but an expression of a policy designed to aid in the effective functioning of government.

The complexities and magnitude of governmental activity have become so great that there must of necessity be a delegation and redelegation of authority as to many functions, and we cannot say that these functions become less important simply because they are exercised by officers of lower rank in the executive hierarchy." [1]

The logic of this thesis, we think, endues Philco with the attributes of a Federal agency in the problem of this controversy. Indisputably, the Government by the contract bared and confided State secrets to Philco. The company was imparted, and it worked in, knowledge exclusively the sovereign's. It was a sharing of confidence, quite aside from a subcontract for the production of defense supplies. So it was that the company and such of its employees as were confidants were answerable for keeping the nation's secrets, as fully as if they were governed by the oath of a Federal official. Closely performing his duties and charged with equal responsibility and loyalty, we think the company and its trusted personnel were imbued with the official's character, and partake of his immunity to liability, whenever and wherever he would enjoy the absolute privilege.

The further question is whether a Federal agency or employee would in the position of Philco and its trusted employees be accorded the unqualified privilege. In this determination we do not encounter the difficult resolutions—particularly the scope of the libeler's duty, and the medium used, to issue the sullying statements—which confronted the Court in Barr v. Matteo, supra, 360 U.S. 564, 79 S.Ct. 1335 and Howard v. Lyons, supra, 360 U.S. 593, 79 S.Ct. 1331. These are absent here for, as we have seen, no doubt existed of the right of Philco to make the communication. It was mandatory, and immediately within the province of Philco's functions. Again, here no open publication of the alleged libel was

1. 360 U.S. at 571–573, 79 S.Ct. at 1339–1340 (Harlan, J., joined by 3 justices). Justice Black's concurrence, necessary to the Court's judgment, stressed the public interest, which he found satisfied by the unhindered public comment of responsible government officials, a consideration not in the case at hand.

made, but only a confidential transmittal within the internal operations of the Government. These considerations would excuse a Federal agency or employee.

In Matteo, supra, 360 U.S. at 575, 79 S.Ct. at 1341, the judgment recognized the exemption of one who acts under an obligation to the Government, saying:

"That petitioner was not *required* by law or by direction of his superiors to speak out cannot be controlling in the case of an official of policy-making rank, for the same considerations which underlie the recognition of the privilege as to acts done in connection *with a mandatory duty* apply with equal force to discretionary acts at those levels of government where the concept of duty encompasses the sound exercise of discretionary authority." (Accent added.)

That an utterance plainly commanded by the duties of the author to the Government has been repeatedly recognized as unconditionally privileged is demonstrated by Preble v. Johnson, 275 F.2d 275 (10 Cir. 1960) and Standard Nut Margarine Co. of Florida v. Mellon, 63 App.D.C. 339, 72 F.2d 557 (1934).

Although dissenting from the complete exoneration of libel granted in *Matteo*, the Chief Justice, joined by Mr. Justice Douglas, conceded that:

"It may be assumed, *arguendo*, that a government employee should have absolute immunity when according to his duty he makes internal reports to his superior or to another upon his superior's order. Cf. Taylor v. Glotfelty, [6 Cir.] 201 F.2d 51; Farr v. Valentine, 38 App.D.C. 413 [Ann.Cas.1913C, 821]; DeArnaud v. Ainsworth, 24 App.D.C. 167 [5 L.R.A.,N.S., 163]. This might be a practical necessity of government that would find its justification in the need for a free flow of information within every executive department. It may not be unreasonable to assume that if a maliciously false libel is uttered in an internal report, it will be recognized as such and discredited without further dissemina-

tion." (360 U.S. p. 582, 79 S.Ct. p. 1345.)

He further commented:

"Releases to the public from the executive branch of government imply far greater dangers to the individual claiming to have been defamed than do internal libels. First, of course, a public statement—especially one arguably libelous—is normally intended for and reaches a larger audience than an internally communicated report. Even if the release can later be shown libelous, it is most unusual for a libeled person to obtain the same hearing that was available for the original press release. Second, a release is communicated to a public in no position to evaluate its accuracy; where the report is made internally, the superior is usually in a position to do so. If the report is false, the superior can undo much of the harm of the report by countermanding it or halting its spread." (p. 583, 79 S.Ct. p. 1346.)

The distinction between a public and an intramural issuance of the slander was stressed in Poss v. Lieberman, 299 F.2d 358, 360 (2 Cir. 1962):

"There has been some uncertainty among scholars as to the reach of absolute privilege to the lower echelons of administrative employees. Cf. Prosser on Torts, 2d ed. (1955), Sec. 95, p. 612. While the language of the recent cases indicates an unlimited reach to the privilege, it may be possible that a case involving such an administrative employee at a minor grade might lead to a reexamination of the language. Plainly, though, there is better reason to hold the privilege absolute *when applied to reports required or permitted to be made within an agency in the normal functioning of the agency's business,* when these reports are required to be confidential as here and their disclosure would be a misdemeanor * * *." (Accent added.)

Finally, it may not be amiss to note that we do not decide that the plaintiffs were rightly suspended, or cannot be restored to their classified positions, or can-

not recapture their lost wages. Our decision only determines that an action for libel will not lie in the circumstances against a private party fulfilling its governmentally imposed duty to inform. Presumably to correct injustice incident to the exaction of this duty, the administrative proceedings heretofore noted were provided. Whether they give adequate redress or whether other remedies are available are questions not intended to be answered here. Certainly we do not deny the existence of any such other remedies.

The judgment of the District Court will not be overturned.

Affirmed.